# UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### DURHAM DIVISION

In re:

WENDY BIVENS                                    Bankruptcy Case No. 14-80841

                           Debtor.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

WENDY BIVENS,

                         Plaintiff,

                                  Adversary Proceeding No. _____

v.

NEWREZ LLC f/k/a NEW PENN
FINANCIAL, LLC and d/b/a SHELLPOINT
MORTGAGE SERVICING and
CITIMORTGAGE, INC.,

                         Defendants.

## <u>COMPLAINT</u>

## I.    <u>INTRODUCTION</u>

1.    This action is brought by Plaintiff Wendy Bivens against Defendants NewRez LLC, which was formally known as New Penn Financial LLC, and which does business as Shellpoint Mortgage Servicing, and CitiMorgage, Inc. for violations of federal law.

2.    Ms. Bivens seeks relief under the Bankruptcy Code, 11 U.S.C. § 101 *et*

*seq.*

3.      Ms. Bivens received her discharge after NewRez and CitiMortgage, pursuant to the chapter 13 plan, had received ongoing monthly payments and payments that cured the prepetition arrearage.

4.      Shortly before discharge, NewRez filed a Response to Notice of Final Cure Payment that stated that the prepetition arrearage had been cured and that Ms. Bivens was current with all postpetition payments. Ms. Bivens resumed sending her monthly payments directly to NewRez and has made all payments owed to NewRez since being instructed by the Chapter 13 Trustee to resume those payments. Despite all of this, NewRez has claimed that Ms. Bivens is months behind on her payments and has threatened to accelerate her loan and take her home.

5.      These wrongful actions were caused by each defendant's decision not to treat the Account consistent with the Confirmation Order, which required – unremarkably – that the ongoing monthly payments be applied to the ongoing monthly payments and the prepetition arrearage payments be applied to the prepetition arrearage payments. Instead, the defendants applied the ongoing and arrearage payments inconsistent with the Confirmation Order, causing there to be an allegedly past due balance upon discharge (despite NewRez having filed a

Response to Notice of Final Cure Payment agreeing that the prepetition arrearage had been cured and Ms. Bivens was current as to postpetition payments).

6.      NewRez chose not to file a forthright and honest Response to Notice of Final Cure (a Response based on its account records and consistent with how the account would be treated after discharge). Instead, it filed a Response that concealed from Ms. Bivens, her counsel, Trustee Hutson, and this Court the years of misapplied payments, failure to credit payments in line with the plan, and its failure to file Notices as to postpetition fees, charges, and expenses.

7.      CitiMortgage's and NewRez's failure to credit and apply payments correctly and NewRez's later decision to hide these issues from all involved caused Ms. Bivens to be threatened with foreclosure even though Trustee Hutson had made all payments due under the plan and Ms. Bivens made all direct payments due thereafter. NewRez's decision not to file a forthright and honest Response to Notice of Final Cure prevented all interested parties from addressing these issues in an expeditious manner consistent with Fed.R.Bankr.P. 3002.1(h) ("Rule __"), which would have avoided everything that happened thereafter, including this adversary proceeding.

## II.    **JURISDICTION**

8.    This is a core proceeding, as that term is defined by 28 U.S.C. §157(b)(2), in that it concerns claims and matters arising out of the administration of this bankruptcy case and rights duly established under Title 11 of the United States Code, and other applicable federal law. To the extent this Court may find this to be a non-core proceeding, the Plaintiff consents to the entry of a final order in this matter by the Bankruptcy Court, in accordance with 28 U.S.C. §157(c)(2).

9.    This Court has jurisdiction to enter a final and dispositive order in this matter under the decision in *Budget Services Co. v. Better Homes of Virginia*, 804 F.2d 289 (4th Cir. 1986).

10.    This Bankruptcy Court has both personal and subject matter jurisdiction to hear matters herein raised pursuant to 28 U.S.C. §§ 157(b)(2) and 1334, and pursuant to the Local Rule 82.11 of the United States District Court for the Middle District of North Carolina, in accordance with the Bankruptcy Amendments and Federal Judgeship Act of 1984.

11.    Venue is proper as all relevant events occurred here.

### III.    **PARTIES**

#### A.    **Plaintiff Wendy Bivens**

12.    Plaintiff Wendy Bivens is an individual that lives in Durham, North Carolina.

13.    Ms. Bivens had a mortgage account (the "Account") held and/or serviced CitiMortgage, Inc. that was later transferred to Ditech Financial LLC, which was then transferred to New Penn Financial LLC (d/b/a Shellpoint Mortgage Servicing), which was then transferred to NewRez LLC (d/b/a Shellpoint Mortgage Servicing). The Account related to a promissory note secured by Ms. Bivens's principal residence.

14.    Ms. Bivens is a "debtor" as defined by the Bankruptcy Code, 11 U.S.C. § 101(13).

#### B.    **Defendant CitiMortgage, Inc.**

15.    Defendant CitiMorgage, Inc. ("CitiMortgage") is mortgage company with its principal address in O'Fallon, Missouri.

#### C.    **Defendant NewRez LLC**

16.    Defendant NewRez LLC ("NewRez") is a mortgage company with its principal office in Fort Washington, Pennsylvania.

17.     NewRez was formerly known as New Penn Financial, LLC ("New Penn Financial").

18.     At the time that NewRez was known as New Penn Financial, LLC, it did business as Shellpoint Mortgage Servicing.

19.     In July 2018, New Penn Financial was acquired by New Residential Investment Corp.

20.     In 2019, New Penn Fianncial was rebranded as NewRez.

21.     NewRez currently does business as Shellpoint Mortgage Servicing ("Shellpoint").

22.     All references herein to New Penn are references to NewRez.

23.     All actions taken by New Penn are the responsibility of, and in fact were taken by, NewRez.

24.     All references herein to Shellpoint are references to NewRez.

25.     All actions taken by Shellpoint are the responsibility of, and in fact were taken by, NewRez.

## IV.    FACTUAL ALLEGATIONS

26.     At all times relevant hereto, Ms. Bivens was owner of record of certain real property located at 1618 South Alston Avenue, Durham, North Carolina (the

"Property"). She has maintained the Property as her primary residence for over fifty years – it was built the year she was born and she has lived there ever since.

27.     For most of the life of the loan, Ms. Bivens maintained timely payments on the Account.

28.     The Account was secured by a Deed of Trust recorded with the Durham County Register of Deeds on April 28, 2004, at Book 4365, Pages 994-1009, Instrument # 2004021327 ("the Deed of Trust").

29.     On July 31, 2014, Plaintiff filed a Voluntary Petition under Chapter 13 of the United States Bankruptcy Code ("the Petition"). The Property was listed on Schedule A. CitiMortgage and the Account were listed on Schedule D. *In re Bivens*, Case # 14-80841, Bankr.M.D.N.C., Docket # 1 (unless otherwise noted, all references herein to "Docket # __" or "Proof of Claim # __" refer to the filings in Case # 14-80841, Bankr.M.D.N.C.). Ms. Bivens proposed paying the Account as a long term debt with the prepetition arrearage paid over the life of the chapter 13 plan.

30.     On August 1, 2014, this Court issued a Notice of Chapter 13 Bankruptcy case, Meeting of Creditors, & Deadlines. Docket # 7. The Notice stated that the Meeting of Creditors would take place on September 5, 2014. It also stated that December 4, 2014, was the "Deadline to File a Proof of Claim" for all creditors. The

Notice also stated in bold print, "It is recommended that secured claims are filed prior to the date of the creditor's meeting" – *i.e.*, September 5, 2014. The Notice was served on CitiMortgage. Docket # 13.

31.     CitiMortgage did not file a proof of claim by September 5, 2014.

32.     On September 8, 2014, Ms. Bivens proposed an amended chapter 13 plan, which did not change the previously proposed treatment of the Account, *i.e.*, it proposed to pay the Account as a long term debt and the prepetition arrearage over the life of the plan. Docket # 17.

33.     On September 16, 2014, the Clerk of Court filed a Notice of Proposed Plan and Order Confirming Plan and Time for Filing Objection Thereto. Docket # 19. The Notice was served on CitiMortgage. Docket # 20.

34.     The Proposed Plan contained the following

    **D.     Secured Claims**

    **1.     Long-term Debts - To be paid by Trustee**

| Creditor & Property | Claim Filed (Y/N) | Monthly Payment | Monthly Payment to Begin | Arrears Through | Arrears Amount | Monthly Payment on arrears |
|---|---|---|---|---|---|---|
| **CitiMortgage 1618 South Alston Avenue Durham, NC** | **N** | **$1,128.00 Est. Per debtor(s)** | **11/14** | **10/14** | **Unknown** | **To be determined** |

35.     The Chapter 13 plan was subsequently confirmed by order of this Court

on October 17, 2014 ("the Confirmation Order"). Docket # 21. The Confirmation

Order included the following regarding CitiMortgage's secured claim:

### D.    Secured Claims

### 1.    Long-term Debts - To be paid by Trustee

| Creditor & Property | Claim Filed (Y/N) | Monthly Payment | Monthly Payment to Begin | Arrears Through | Arrears Amount | Monthly Payment on arrears |
|---|---|---|---|---|---|---|
| **CitiMortgage** **1618 South Alston Avenue** **Durham, NC** | N | **$1,128.00** **Est. Per** **debtor(s)** | **11/14** | **10/14** | **Unknown** | **To be** **determined** |

Docket # 21.

    36.    This Court's Standing Order incorporated into the Confirmation Order

at paragraph III-G stated:

> B.    THE FOLLOWING PROVISIONS ARE APPLICABLE TO THE HOLDER OR SERVICER ("HOLDER") OF A CLAIM SECURED BY A DEED OF TRUST, MORTGAGE OR SECURITY INTEREST IN REAL PROPERTY OR A MOBILE HOME:

> 1.    The creditor, upon confirmation, is precluded from imposing late charges or other default related fees based solely on pre-confirmation default.

> 2.    If the trustee is disbursing ongoing monthly installment payments (hereinafter "ongoing payments"), the creditor must apply each ongoing payment to the month in which the payment is designated.

> ***

6.      Nothing herein shall modify the creditor's responsibilities under Bankruptcy Rule 3002.1.

7.      Unless the court orders otherwise, an order granting a discharge in the case shall be a determination that all prepetition and postpetition defaults have been cured and the account is current and reinstated on the original payment schedule under the note and security statement as if no default had ever occurred.

8.      **PENALTY FOR FAILURE OF CREDITOR TO COMPLY WITH THE REQUIREMENTS OUTLINED UNDER FRBP 3002.1 AND THIS STANDING ORDER**. Any willful failure of the creditor to credit payments in the manner required by FRBP 3002.1 and this Standing Order or any act by the creditor following the entry of discharge to charge or collect any amount incurred or assessed prior to the filing of the Chapter 13 Petition or during the pendency of the Chapter 13 case that was not authorized by the order confirming plan or approved by the court after proper notice shall be a violation of 11 U.S.C. §524(i) and the injunction under 11 U.S.C. §524(a)(2).

Docket #21; Standing Order entered February 24, 2012, ¶ B-2 (found at

http://www.ncmb.uscourts.gov/sites/default/files/general-ordes/

Standing%20Order%20-%20CH%2013%20Confirmation%202012_0.pdf) (emphasis

in original).

37.     On November 14, 2014, CitiMortgage filed Proof of Claim # 3, asserting

a claim secured by Ms. Bivens's principal residence. Proof of Claim # 3 included a

"Part 2," which included a Mortgage Claim Attachment form.

38.     Part 2 of the Mortgage Claim Attachment form included in Proof of Claim # 3 Part 2 ("Statement of Pre-Petition Fees, Expenses, and Charges") stated that the "Total prepetition fees, expenses, and charges" was $2,130.43. This amount consisted of Late Charges, Property Inspection Fees, Escrow Shortage, and Interest on Escrow Advance.

39.     Part 3 of the Mortgage Claim Attachment form included in Proof of Claim # 3 Part 2 ("Statement of Amount Necessary to Cure Default as of the Petition Date") stated that the "Amount of Installment payments due" included five installment payments covering July, July, August, September, and October 2014 (as well as other prepetition fees, expenses, and charges). Therefore, the prepetition arrearage included installment payments due July through October 2014.

40.     On July 30, 2015, this Court entered an order amending CitiMortgage's Claim # 3 to provide for monthly payments in the amount of $1,069.54, effective August 2015. Docket # 29.

41.     On December 9, 2016, a Transfer of Claim Other Than for Security was filed, giving notice that Claim # 3 was transferred from CitiMortgage, Inc. to Ditech Financial LLC, with notices and payments to be sent to Ditech Financial LLC. Docket # 44. The related Corporate Assignment of Deed of Trust was recorded by

CitiMortgage with the Durham County Register of Deeds on March 21, 2016.

42.     On July 19, 2017, a Transfer of Claim Other Than for Security was filed, giving notice that Claim # 3 was transferred from Ditech Financial LLC to "New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing," with notices and payments to be sent to Shellpoint. Docket # 46. The related Corporate Assignment of Deed of Trust was recorded by Ditech Financial LLC with the Durham County Register of Deeds on July 11, 2017.

43.     On January 29, 2020, Trustee Hutson filed a Notice of Final Cure Payment, identifying New Penn Financial LLC as the creditor and indicating that an arrearage claim for Claim # 3 was allowed in the amount of $7,011.61 and that the amount paid by Trustee Hutson on that arrearage claim was $7,011.61. Docket # 60.

44.     The Notice of Final Cure also stated:

> Within 21 days of the service of the Notice of Final Cure Payment, the creditor MUST file and serve a Statement as a supplement to the holder's proof of claim on the Debtor, Debtor's Counsel and the Chapter 13 Trustee, pursuant to Fed.R.Bank.P.3002.1(g), indicating 1) whether it agrees that the Debtor has paid in full the amount required to cure the default on the claim; and 2) whether the Debtor is otherwise current on all payments consistent with 11 U.S.C. § 1322(b)(5).
>
> The statement shall itemize the required cure or post-petition amounts, if any, that the holder contends remain

unpaid as of the date of the statement. The statement shall be filed as a supplement to the holder's proof of claim and is not subject to Rule 3001(f). Failure to notify may result in sanctions.

Docket # 60.

45.    The Notice of Final Cure Payment was served on New Penn Financial, LLC c/o Shellpoint. Docket # 60.

46.    On February 14, 2020, "NewRez LLC dba Shellpoint Mortgage Servicing" filed a Response to Notice of Final Cure Payment, which referred to Claim # 3 and stated, "Creditor agrees that the debtor(s) have paid in full amount required to cure the prepetition default on the creditor's claim." Docket # 61.

47.    The Response to Notice of Final Cure also stated, "Creditor states that the debtor(s) are current with all postpetition payments consistent with § 1322(b)(5) of the Bankruptcy Code, including all fees, charges, expenses, escrow, and costs. The next postpetition payment from the debtor(s) is due on: 02/01/2020." Docket # 61.

48.    On February 19, 2020, a Transfer of Claim Other Than for Security was filed, giving notice that Claim # 3 was transferred from "New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing" to "NewRez LLC d/b/a Shellpoint Mortgage Servicing," with notices and payments to be sent to Shellpoint. This Transfer of

Claim was filed by Mukta Suri, an attorney not licensed to practice in North Carolina, but licensed to practice in the State of Texas. Docket # 62. No Corporate Assignment Deed of Trust was recorded with the Durham County Register of Deeds.

49.    On April 9, 2020, Trustee Hutson filed a Notice of Completion of Plan Payments to Chapter 13 Trustee, which stated, "The undersigned Trustee hereby notifies the Court and other interested parties that all payments to the Trustee have been completed pursuant to the confirmed plan." Docket # 64.

50.    Ms. Bivens made all payments required under the Confirmation Order.

51.    On June 1, 2020, this Court entered an Order of Discharge pursuant to 11 U.S.C. § 1328. Docket # 69.

52.    The Order of Discharge was served on NewRez. Docket # 73.

53.    On June 2, 2020, Trustee Hutson filed his Final Report and Account, which stated, among other things, that 1) $7,011.61 was paid on the arrearage claim held by NewRez and allowed in the amount of $7,011.61; and 2) $75,277.43 was paid on the ongoing monthly claim. Docket # 70.

54.    On June 2, 2020, Trustee Hutson also filed the Notice of Filing of Trustee's Final Report. It stated:

> A full copy of the Final Report is on file with the Clerk. If
> you did not receive the amount paid from the Trustee, you
> may file a written objection to the Trustee's Final Report
> with the Clerk's Office. If no objection is filed within thirty
> (30) days from the date of this Notice, the Final Report
> shall be approved. If an objection is filed, a hearing may
> be scheduled.

Docket # 71. The Notice of Filing of Trustee's Final Report was served on NewRez.

Docket # 71.

55.    NewRez did not object to the Trustee's Final Report.

56.    CitiMortgage received its first ongoing monthly payment from Trustee Huston in early December 2014. Both CitiMortgage's payment history and Shellpoint's Loan History Summary (both provided in response to Requests for Information) show that CitiMortgage applied the ongoing monthly payments received from Trustee Richard Hutson to monthly payments due for months prior to the date that Ms. Bivens filed her voluntary petition. In other words, CitiMortgage 1) applied Trustee Hutson's ongoing monthly payments to the prepetition arrearage; 2) did not apply those ongoing monthly payments to payments due for months as designated; and 3) applied those ongoing monthly payments in a manner inconsistent with the Confirmation Order and the Standing Order incorporated therein.

57.     Upon information and belief, this pattern of payment misapplication continued while Ditech serviced the Account.

58.     This pattern of payment misapplication continued during New Penn's servicing of the Account. New Penn, while doing business as Shellpoint, 1) applied Trustee Hutson's ongoing monthly payments to the prepetition arrearage; 2) did not apply those ongoing monthly payments to payments due for months as designated; and 3) applied those ongoing monthly payments in a manner inconsistent with the Confirmation Order.

59.     When CitiMortgage began receiving the prepetition arrearage payments from Trustee Hutson, those payments were applied not to the prepetition arrearage but instead to the escrow account. In other words, those prepetition arrearage payments were 1) applied to the escrow account; 2) not applied to the prepetition arrearage; and 3) applied in a manner inconsistent with the Confirmation Order.

60.     Shellpoint did not correct any of these misapplications of payment during its servicing of the account. Instead, it continued the misapplication of payments.

61.     Additionally, when CitiMortgage was servicing the Account during the bankruptcy, it assessed fees, expenses, and charges to the Account without notifying

this Court pursuant to Rule 3002.1(c). For example, it assessed the following non-exhaustive list of fees, expenses, and charges to the Account without disclosing them to Ms. Bivens, Ms. Bivens's counsel, or Trustee Hutson: late charges, foreclosure attorney fees, "bankruptcy costs," property inspections, "technology fees," appraisal fees, and "elec invoice fees."

62.    When Shellpoint took over servicing of the Account, it did not take any actions to negate the effect of CitiMortgage's wrongful assessment of the fees, expenses, and charges.

63.    Additionally, during the time that Shellpoint was servicing the Account, it assessed fees, expenses, and charges to the Account without filing the requisite notice pursuant to Rule 3002.1(c). For example, it assessed the following non-exhaustive list of fees, expenses, and charges to the Account without disclosing them to Ms. Bivens, Ms. Bivens's counsel, or Trustee Hutson: property inspections, broker price opinions, appraisals, attorney fees, court costs, and bankruptcy costs.

64.    Shellpoint sent Mortgage Statements to Ms. Bivens in 2019 that were consistent with CitiMortgage's and Shellpoint's pattern of misapplying payments received from Trustee Hutson and Shellpoint's assessment of fees, charges, and expenses without disclosing them. For example:

A.    Shellpoint sent Ms. Bivens a Mortgage Statement dated June 17, 2019, claiming that $4,481.45 was the "Past Unpaid Amount" and that the payment received from Trustee Hutson in June 2019 was applied to the payment due March 1, 2019.

B.    Shellpoint sent Ms. Bivens a Mortgage Statement dated September 17, 2019, claiming that $4,293.59 was the "Past Unpaid Amount" and that the payment received from Trustee Hutson in September 2019, was applied to the payment due June 1, 2019. It also stated that the "Fees/Late Charges" paid year-to-date was $133.50. However, Shellpoint never filed the requisite notice pursuant to Rule 3002.1(c).

C.    Shellpoint sent Ms. Bivens a Mortgage Statement dated October 18, 2019, claiming that the "Past Unpaid Amount" had increased from $4,293.59 to $5,726.23. Shellpoint did this because, instead of applying the payment it received from the Trustee on October 16, 2019, to the month designated, it applied the entirety of the payment to the escrow account.

D.    Shellpoint sent Ms. Bivens a Mortgage Statement dated November 17, 2019, claiming that $5,726.23 was the "Past Unpaid Amount" and that the payment received from Trustee Hutson in November was applied to the payment due July 1, 2019.

65.    Additionally, the statements sent just before discharge and the statements and letters threatening foreclosure sent after discharge (described below) are similarly consistent with CitiMortgage's and Shellpoint's pattern of misapplying payments received from Trustee Hutson, failing to disclose charges pursuant to Rule 3002.1(c), and failing to provide a forthright and honest response to the Notice of

Final Cure Payment, as required by Rule 3002.1(g).

66.    Dated March 9, 2020, Trustee Hutson's office sent Ms. Bivens a letter

that referred to the Account and stated:

> Dear Ms. Bivens:
>
> We are presently auditing your file for closing. Your mortgage payments were being paid through the plan as a continuing debt. You should begin making payments directly to the below-entitled mortgage holder at the indicated address beginning April 1, 2020, in the amount of $1,432.64. Your payments should be made payable to:
>
> NewRez LLC d/b/a Shellpoint Mortgage Servicing
> P O Box 10826
> Greenville, South Carolina 29603-0826
>
> By copy of this letter, we are notifying the mortgage holder that your case is closing and you will begin making monthly payments directly as indicated above. If you have any questions or need any further information concerning this matter, please contact the mortgage holder.

67.    One month after NewRez filed the Response to Notice of Final Cure

Payment stating that Ms. Bivens was current with all postpetition payments,

including all fees, charges, expenses, escrow, and costs, Shellpoint sent Ms. Bivens

a mortgage statement claiming she was past due over eight thousand dollars.

68.    Shellpoint sent Ms. Bivens a Mortgage Statement dated March 18, 2020,

which stated that the "Regular Monthly Payment" was $1,432.64, the "Past Unpaid

Amount" was $8,297.22, for a "Total Payment Amount" $9,729.86 due April 1, 2020. The Mortgage Statement also contained a section of "Transaction Activity" containing, *inter alia*, a "Late Charge Waive" [sic] of $80.92; a "Court Costs Payment" of $75.00; an "Attorney Cost Payment" of $50.00; twenty-six "Reversal of Regular Payment" in varying amounts; five "Reversal of Regular Payment with Adjust" of in varying amounts; four "Partial Payment Unapplied" of amounts ranging from $1,045.01 to $36,402.35 each; two "Reversal of Unapplied Payment" of $1,450.76 each; and "Regular Payment - (Due [dates ranging from April 2017 through September 2019]) in varying amounts.

69.    In line with the letter from Trustee Hutson, Ms. Bivens began making her payments directly to Shellpoint beginning with the payment due April 1, 2020.

70.    On March 28, 2020, Ms. Bivens called Shellpoint and made a payment by phone.

71.    Additionally, Trustee Hutson's records show that his office made its final ongoing monthly payment to Newrez on March 31, 2020, in the amount of $1,432.64.

72.    The proximal payments from Ms. Bivens and Trustee Hutson were reflected in the next Mortgage Statement that Shellpoint sent to Ms. Bivens.

73.     Shellpoint sent Ms. Bivens a Mortgage Statement dated April 17, 2020, which stated that the "Regular Monthly Payment" was $1,432.64, the "Past Unpaid Amount" was $6,864.58, for a "Total Payment Amount" $8,297.22 due May 1, 2020. The "Transaction Activity" section shows that Shellpoint had received a payment of $1,432.64 on March 28 (Ms. Bivens's payment) and a payment of $1,432.64 on April 6 (Trustee Hutson's payment).

74.     The Mortgage Statement's Transaction Activity described Ms. Bivens's payment as being "Due 10/1/2019" and Trustee Hutson's payment being "Due 11/1/2019."

75.     The Transaction Activity comports with Shellpoint's Loan History Summary, which shows that the payment with a Transaction Date of March 28, 2020, was "Due" October 1, 2019 and the payment with a Transaction Date of April 6, 2020, was "Due" November 1, 2019.

76.     As of February 14, 2020 (the date that NewRez filed its Response to Notice of Final Cure, stating that the "next postpetition payment from the debtor(s) is due on 02/01/2020"), Shellpoint's Loan History Summary showed that the then-current "Due Date" was actually October 2019.

77.     The Transaction Activity contained in the Mortgage Statement and the

Loan History Summary show that Shellpoint misapplied and failed to credit payments received from Trustee Hutson during the Chapter 13 plan and sought to collect several of those payments a second time from Ms. Bivens.

78.     The Transaction Activity contained in the Mortgage Statement and the Loan History Summary also show that NewRez misrepresented to this Court in its Response to Notice of Final Cure Payment that the "next postpetition payment" was due February 1, 2020. Indeed, at the time, NewRez's records did not reflect that payments had been made for months October 2019 through January 2020.

79.     Had NewRez been forthright and honest with this Court, provided information based on its account records, and not misrepresented that crucial information, the issue with Ms. Bivens's mortgage account could have been resolved expeditiously prior to discharge, pursuant to Rule 3002.1(h), avoiding the material injury later caused by CitiMortgage and NewRez.

80.     Additionally, CitiMortgage's and Shellpoint's failures to comply with Rule 3002.1(c) prevented Ms. Bivens, her counsel, and Trustee Hutson from utilizing Rule 3002.1(e) by moving this Court to "determine whether payment of any claimed fee, expense, or charge is required by the underlying agreement and applicable nonbankruptcy law to cure a default or maintain payments in accordance with §

1322(b)(5) of the Code."

81.     On April 30, 2020, Ms. Bivens called Shellpoint and made a payment by phone.

82.     Shellpoint sent Ms. Bivens a Mortgage Statement dated May 18, 2020, which stated that the "Regular Monthly Payment" was $1,432.64, the "Past Unpaid Amount" was $6,864.58, for a "Total Payment Amount" $8,297.22 due June 1, 2020. The "Transaction Activity" section shows that Shellpoint had received Ms. Bivens's payment of $1,432.64 on April 30 and described the payment as being "Due 12/1/2019."

83.     In a letter dated June 2, 2020 – one day after the Order of Discharge was entered – Shellpoint threatened Ms. Bivens with foreclosure of her home.

84.     Shellpoint sent Ms. Bivens a Notice of Default and Intent to Accelerate dated June 2, 20202. The Notice of Default referred to the Account and stated:

> The Loan associated with the Security Instrument is in default for failure to pay amounts due.
>
> To cure this default, you must pay all amounts due under the terms of the Note and Security Instrument.
>
> As of 06/02/2020, the total amount necessary to bring the Loan current is $6,864.58 (the "Amount due").
>
> ***

You are further informed that despite any departure from the terms of your loan that may have occurred, from this point forward strict compliance with the exact terms of the loan will be required.

If you have not cured the default within forty-five (45) days of this notice, Shellpoint intends to accelerate the sums evidenced by the Note and Security instruments and declare same due and payable in full and to take other legally and contractually permitted action to collect the same, including foreclosure of the lien on the Property and sale of the Property.

***

You have the right to reinstate the Loan and the right to bring an action to have the foreclosure action dismissed, claim that your loan is not in default or any other defense to acceleration and sale that you may have including the right in any lawsuit for Foreclosure and Sale to argue that you kept your promises and agreements under the Note and Security Instruments and to present any other defenses that you may have. This notice remains in effect until the default is cured.

85.     The Notice also stated that the total amount due was $6,864.58 and included the threat, "You have forty-five (45) days to bring the loan current prior to foreclosure proceedings being initiated."

86.     On June 2, 2020, Ms. Bivens set up online account access for her account and made a payment.

87.     On or about June 11, 2020, Nikki West from Ms. Bivens's attorney's

office called Shellpoint. She was connected with Cassandra in Customer Service, who transferred Ms. West to Logan in Loss Mitigation. Ms. West told Logan that Ms. Bivens had just been discharged from a bankruptcy and that Shellpoint had sent her a Notice of Default and Intent to Accelerate. Logan told Ms. West that Ms. Bivens owed $6,872 as of June 11, 2020. Logan then transferred Ms. West to the Bankruptcy Department.  Brittany in the Bankruptcy Department told Ms. West that Ms. Bivens was past due for February through June 2020. Ms. West explained to Brittany that Trustee Hutson instructed Ms. Bivens to resume her mortgage payments directly to Shellpoint beginning April 1, 2020, and that she had proof of all payments made from April through June 2020. Ms. West also told Brittany that the most recent statement Ms. Bivens received from Shellpoint, dated 5/18/20, stated that she owed $8,297.22 by June 1 and that Ms. Bivens recently received a Notice of Default and Intent to Accelerate threatening her with foreclosure if she did not pay $6,864.58 within forty-five days. Brittany placed Ms. West on hold for an extremely long time. Upon returning, Brittany stated that she had someone working on it to see if they can get things resolved but it will take three to five business days and suggested Ms. West call back.

88.     Shellpoint sent Ms. Bivens a Mortgage Statement dated June 18, 2020,

which stated that the "Regular Monthly Payment" was $1,432.64, the "Overdue Payment" was $6,864.58, and included "Total Fees and Charges" of $15.00 (for an unwarranted property inspection on June 10, 2020), for a "Total Amount Due" of $8,312.22. The "Transaction Activity" section shows that Shellpoint had received Ms. Bivens's payment of $1,432.64 on June 2 and described the payment as being "Due 1/1/2020." The Mortgage Statement also claimed that the "Contractual Due Date" of the Account was February 1, 2020.

89.   On or about June 23, 2020, Ms. West called Shellpoint and, after nearly 30 minutes on the telephone, no one at Shellpoint was able explain to Ms. West why the account was in default. The representative Asyeti told Ms. West that a supervisor had to provide the results of an audit that had been performed, but that the supervisor was not there and that Shellpoint is "backed up with their audits." Asyeti told Ms. West to called back five to seven days later.

90.   On July 3, 2020, Ms. Bivens attempted to make her payment online but discovered that her online account had been closed. She called Shellpoint and was told that she could no longer make online or telephone payments if only paying for one month. Ms. Bivens was then required to mail her payments. She did so.

91.   Shellpoint sent Ms. Bivens a Mortgage Statement dated July 18, 2020,

which stated that the "Regular Monthly Payment" was $1,432.64, the "Overdue Payment" was $6,879.22, and included "Total Fees and Charges" of $15.00 (for an unwarranted property inspection on July 13, 2020), for a "Total Payment Amount" $8,326.86. The "Transaction Activity" section shows that Shellpoint had received Ms. Bivens's payment of $1,432.64 on July 10 and described the payment as being "Due 2/1/2020." The Mortgage Statement also claimed that the "Contractual Due Date" of the Account was March 1, 2020.

92.    Shellpoint sent Ms. Bivens a Notice of Default and Intent to Accelerate dated July 15, 20202. The Notice of Default referred to the Account and stated:

> The Loan associated with the Security Instrument is in default for failure to pay amounts due.
>
> To cure this default, you must pay all amounts due under the terms of the Note and Security Instrument.
>
> As of 07/15/2020, the total amount necessary to bring the Loan current is $6,894.58 (the "Amount due").
>
> ***
>
> You are further informed that despite any departure from the terms of your loan that may have occurred, from this point forward strict compliance with the exact terms of the loan will be required.
>
> If you have not cured the default within forty-five (45) days of this notice, Shellpoint intends to accelerate the

sums evidenced by the Note and Security instruments and declare same due and payable in full and to take other legally and contractually permitted action to collect the same, including foreclosure of the lien on the Property and sale of the Property.

\*\*\*

You have the right to reinstate the Loan and the right to bring an action to have the foreclosure action dismissed, claim that your loan is not in default or any other defense to acceleration and sale that you may have including the right in any lawsuit for Foreclosure and Sale to argue that you kept your promises and agreements under the Note and Security Instruments and to present any other defenses that you may have. This notice remains in effect until the default is cured.

93.     The Notice also stated, "we are hereby giving you notice that we may make or cause to be made reasonable entries upon and inspection of the Property. We will attempt to contact you before we make such entry. \*\*\* This matter is very important. Please give it your immediate attention."

94.     The Notice also stated that the total amount due was $6,894.22 and included the threat, "You have forty-five (45) days to bring the loan current prior to foreclosure proceedings being initiated."

95.     Ms. Bivens and her attorney's office communicated with Shellpoint several times in an attempt to correct the negative situations that CitiMortgage and

Shellpoint caused. Shellpoint consistently gave Ms. Bivens and her attorney's office inaccurate information regarding the Account and still has not corrected the Account.

96.   CitiMortgage misapplied ongoing monthly payments received from the Chapter 13 Trustee to the prepetition arrearage claim. In doing so, CitiMortgage acted to collect, assess, or recover a claim against Ms. Bivens that arose before the commencement of the case.

97.   CitiMortgage misapplied ongoing monthly payments received from the Chapter 13 Trustee to the wrong month. In doing so, CitiMortgage failed to credit payments it received under the Confirmed Plan.

98.   CitiMortgage misapplied prepetition arrearage payments from the Chapter 13 Trustee to ongoing monthly payments allegedly due, as well as entire prepetition arrearage payments to the escrow account. In doing so, CitiMortgage failed to credit payments it received under the Confirmed Plan.

99.   CitiMortgage failed to file a Notice of Post Petition Fees, Charges, and Expenses within 180 days of assessing fees, charges, and expenses to the Account.

100.   CitiMortgage communicated false credit information regarding the Account and Claim # 3 to Ditech Financial LLC. CitiMortgage knew or should have

known that the credit information it communicated to Ditech Financial LLC was false.

101.    CitiMortgage communicated false credit information regarding the Account and Claim # 3 to other persons and entities. CitiMortgage knew or should have known that the credit information it communicated to other persons and entities was false.

102.    CitiMortgage's failure to credit payments received under the confirmed plan caused Ms. Bivens to suffer material injury.

103.    Shellpoint misapplied ongoing monthly payments received from the Chapter 13 Trustee to the prepetition arrearage claim. In doing so, Shellpoint acted to collect, assess, or recover a claim against Ms. Bivens that arose before the commencement of the case.

104.    Shellpoint misapplied ongoing monthly payments received from the Chapter 13 Trustee to the wrong month. In doing so, Shellpoint failed to credit payments it received under the Confirmed Plan.

105.    Shellpoint misapplied prepetition arrearage payments from the Chapter 13 Trustee to ongoing monthly payments allegedly due. In doing so, Shellpoint failed to credit payments it received under the Confirmed Plan.

106.    Shellpoint failed to file a Notice of Post Petition Fees, Charges, and Expenses within 180 days of assessing fees, charges, and expenses to the Account.

107.    Shellpoint communicated false credit information regarding the Account and Claim # 3 to credit reporting agencies, government agencies, third-party vendors, and other persons and entities. Shellpoint knew or should have known that the credit information it communicated to these persons and entities was false.

108.    Shellpoint's failure to credit payments received under the confirmed plan caused Ms. Bivens to suffer material injury.

109.    CitiMortgage's and Shellpoint's direct and indirect conduct caused Ms. Bivens pecuniary loss.

110.    CitiMortgage's and Shellpoint's direct and indirect conduct caused Ms. Bivens's credit score to be reduced.

111.    CitiMortgage's and Shellpoint's direct and indirect conduct caused stress in Ms. Bivens's life.

112.    CitiMortgage's and Shellpoint's direct and indirect conduct caused Ms. Bivens to worry that her home of over fifty years would be taken from her.

113.    CitiMortgage's and Shellpoint's direct and indirect conduct caused Ms.

Bivens to have nightmares about the loss of her home, which wake her up in the middle of the night, disrupting her sleep.

114.   CitiMortgage's and Shellpoint's direct and indirect conduct caused Ms. Bivens to lose several hours of sleeps over many nights.

115.   CitiMortgage's and Shellpoint's direct and indirect conduct caused Ms. Bivens to suffer through the many hours of being unable to fall asleep.

116.   CitiMortgage's and Shellpoint's direct and indirect conduct caused Ms. Bivens to suffer through sleepless nights.

117.   CitiMortgage's and Shellpoint's direct and indirect conduct caused Ms. Bivens to lose focus during her work day.

118.   CitiMortgage's and Shellpoint's direct and indirect conduct caused Ms. Bivens to feel uncomfortable leaving her home, fearing that she will return to see a padlock on the front door.

119.   CitiMortgage's and Shellpoint's direct and indirect conduct caused Ms. Bivens to believe that her home was on a pre-foreclosure list because people were looking at her home and commenting on wanting to live there.

120.   CitiMortgage's and Shellpoint's direct and indirect conduct caused Ms. Bivens to place "No Trespassing" signs on her property.

121.    CitiMortgage's and Shellpoint's direct and indirect conduct caused Ms. Bivens to seek the assistance of a psychiatric medical professional.

122.    CitiMortgage's and Shellpoint's direct and indirect conduct caused Ms. Bivens to lose hope, as she had spent five years in a Chapter 13 bankruptcy, making the required payment every month. Yet, after she received her discharge, she was told that she owed thousands of dollars more than she actually owed, that her payments were behind several months, and that her home of 50 years would be taken from her.

123.    CitiMortgage's and Shellpoint's direct and indirect conduct caused Ms. Bivens to question whether she should have ever filed bankruptcy.

124.    CitiMortgage's and Shellpoint's direct and indirect conduct caused Ms. Bivens to suffer severe and overbearing emotional distress and anxiety.

125.    CitiMortgage and Shellpoint's direct and indirect conduct caused Ms. Bivens to be in a worse situation as to her Account than she had been prior to filing her bankruptcy petition.

126.    Ms. Bivens is entitled to recover damages, both actual and punitive, from CitiMortgage and Shellpoint and is further entitled to recover her costs and reasonable attorney's fees, pursuant to 11 U.S.C. §§ 105(a) and 362(k).

127.    It is CitiMortgage's pattern and practice to act and conduct itself in violation of the Bankruptcy Code.

128.    It is CitiMortgage's pattern and practice to act and conduct itself in violation of federal law.

129.    CitiMortgage's actions and conduct demonstrate its callous, conscious, and intentional disregard of, and indifference to, the rights of others, federal law, and this Court's orders.

130.    It is Shellpoint's pattern and practice to act and conduct itself in violation of the Bankruptcy Code.

131.    It is Shellpoint's pattern and practice to act and conduct itself in violation of federal law.

132.    Shellpoint's actions and conduct demonstrate its callous, conscious, and intentional disregard of, and indifference to, the rights of others, federal law, and this Court's orders.

133.    The effect and resulting distress that CitiMortgage's and Shellpoint's actions have directly affected and degraded the overall quality of life that Ms. Bivens enjoyed prior to CitiMortgage and Shellpoint undertaking the aforementioned actions.

134.    CitiMortgage has a history of undertaking actions and employing collection methods, measures, and means that were in violation of the Bankruptcy Code.

135.    Shellpoint has a history of undertaking actions and employing collection methods, measures, and means that were in violation of the Bankruptcy Code.

136.    Absent an award of punitive damages by this Court, upon information and belief, CitiMortgage and Shellpoint will continue to engage in conduct and undertake actions which are in direct violation of the protections afforded to Ms. Bivens and others before this Court, under the Bankruptcy Code, including the confirmed plan, the Confirmation Order, and/or the Discharge.

## V.    MOTION FOR CONTEMPT AND SANCTIONS AGAINST CREDITORS CITIMORTGAGE, INC. AND NEWREZ LLC

137.    Plaintiff incorporates herein all previous allegations.

138.    Ms. Bivens moves for contempt and sanctions against CitiMortgage, Inc. and NewRez LLC, pursuant to 11 U.S.C. §§ 105 and 524.

139.    Upon entry of the Confirmation Order, the confirmed plan was binding upon Ms. Bivens as well as any and all creditors dealt with thereunder, including any assignees of those claimants or creditors. 11 U.S.C. § 1327; *see, e.g.*, *In re Hayes*,

2018 Bankr. LEXIS 296, *8 (Bankr.E.D.N.C., Feb. 5, 2018).

140.    "Allowing creditors to escape the ramifications of their misapplication of payments by selling or transferring the loans would undercut the purpose of both § 524(a)(2) and § 524(i)." *Williams v. Citifinancial Servicing LLC (In re Williams)*, 612 B.R. 682, 694 (Bankr.M.D.N.C. 2020).

141.    Section 1327, entitled "Effect of Confirmation," provides:

> (a) The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan.

> (b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

> (c) Except as otherwise provided in the plan or in the order confirming the plan, the property vesting in the debtor under subsection (b) of this section is free and clear of any claim or interest of any creditor provided for by the plan.

11 U.S.C. § 1327.

142.    Additionally, the Standing Order incorporated into the Confirmation Order expressly requires that the Trustee's payments be applied as designated and decrees that, unless otherwise ordered, "an order granting a discharge in the case

36

shall be a determination that ... the account is current and reinstated on the original payment schedule under the note and security statement as if no default had ever occurred."

143.    Finally, the Standing Order states that willful failure of the creditor to credit payments in the manner required by Rule 3002.1 and the Standing Order or any act by the creditor following the entry of discharge to charge or collect any amount incurred during the pendency of the Chapter 13 case that was not authorized by the order confirming plan or approved by the court *shall be a violation of 11 U.S.c. §524(i) and the injunction under 11 U.S.C. §524(a)(2).*

144.    CitiMortgage willfully failed to correctly credit payments received under the confirmed plan, in violation of 11 U.S.C. § 524(i).

145.    CitiMortgage's failure to credit payments in the manner required by the confirmed plan caused material injury to Ms. Bivens.

146.    Citifinancial's misapplication and miscrediting of payments received from Trustee Hutson caused a snowballing effect of misinformation, ultimately leading to the harm to Ms, Bivens described above and the necessity of her initiating this adversary proceeding.

147.    Shellpoint willfully failed to correctly credit payments received under

the confirmed plan, in violation of 11 U.S.C. § 524(i).

148.    Shellpoint's failure to credit payments in the manner required by the confirmed plan caused material injury to Ms. Bivens.

149.    Shellpoint's misapplication and miscrediting of payments received from Trustee Hutson, including its failure to properly account for payments it received prior to its handling of the Account, contributed to the harm to Ms, Bivens described above and the necessity of her initiating this adversary proceeding.

150.    If it is demonstrated that a secured creditor misapplied payments made under the Confirmed Plan and then transferred the account with records showing an incorrect payment history and inflated loan balance so as to cause injury to a debtor, those actions could constitute a violation of § 524(i). *Williams*, 612 B.R. at 694. Such allegations are sufficient to state a plausible claim under § 524(i). *Id*.

151.    As Ms. Bivens complied with the Bankruptcy Code, she also relied on CitiMortgage and Shellpoint to comply with the Bankruptcy Code. Had Ms. Bivens known that CitiMortgage or Shellpoint would not comply with the Bankruptcy Code by misapplying and failing to credit payments in the manner required by the confirmed plan, she would have sought this Court's intervention during her bankruptcy to prevent the material injuries caused by CitiMortgage and Shellpoint.

152.    Similarly, had Ms. Bivens known that Shellpoint's Account records were inconsistent with the statements NewRez made to this Court in its Response to Notice of Final Cure, she would have sought this Court's intervention in line with Rule 3002.1(h). However, NewRez misrepresented information to this Court, preventing Ms. Bivens, her counsel, Trustee Hutson, and this Court from utilizing the Bankruptcy Code in order to ensure that, upon discharge, Ms. Bivens received the fresh start she deserved.

153.    The Discharge entered in this case, pursuant to §§ 524 and 1328 of the Bankruptcy Code, "operates as an injunction against . . . an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived...." 11 U.S.C. § 524(a)(2).

154.    Section 105 authorizes this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). *See Marrama v. Citizens Bank*, 549 U.S. 365, 375 (2007) (holding that Section 105(a) grants Bankruptcy Courts "broad authority ... to take any action that is necessary or appropriate to prevent an abuse of process." (internal quotations omitted).

155.    "While a violation of the discharge injunction does not provide an

39

express remedy akin to § 362(k) for violations of the automatic stay, § 105 allows a bankruptcy court to hold a creditor in civil contempt, and impose contempt sanctions, for violating the discharge injunction." *Williams*, 612 B.R. at 690 *citing Taggart v. Lorenzen*, -– U.S. —, 139 S. Ct. 1795, 1801, 204 L.Ed.2d 129 (2019) and *Bradley v. Fina (In re Fina)*, 550 F. App'x 150, 154 (4th Cir. 2014).

156.    "Bankruptcy courts have both an inherent, and as set forth in § 105(a), the statutory power to hold parties in contempt." *Almond v. Ford Motor Credit Co. (In re Almond)*, 2007 Bankr. LEXIS 1595, *15 (Bankr.M.D.N.C., May 7, 2007). Section 105(a) "authorizes a bankruptcy court to hold a party in civil contempt for failing to comply with a previous order." *Cherry v. Arendall (In re Cherry)*, 247 B.R. 176, 186 (Bankr.E.D.Va. 2000) *citing Burd v. Walters (In re Walters)*, 868 F.2d 665 (4th Cir. 1989). "The discharge injunction put in place pursuant to 11 U.S.C. § 524(a) is an order of the Bankruptcy Court whose violation is punishable by the imposition of civil sanctions." *In re Cherry*, 247 B.R. at 187.

157.    Apart from § 105(a) and similar to their Article III counterparts, bankruptcy courts "enjoy inherent power to sanction parties for improper conduct." *Mapother & Mapother, P.S.C. v. Cooper (In re Downs)*, 103 F.3d 472, 477 (6th Cir. 1996). Pursuant to its inherent contempt powers, a bankruptcy court may sanction conduct

"which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). Conduct abusive of the judicial conduct includes "bad faith conduct" and "willful disobedience of a court order." *Id.* at 45-46; *see Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) (emphasizing that, in addition to vexatious, wanton or oppressive conduct, bad faith conduct includes "hampering enforcement of a court order").

158.   To enforce and carry out the provisions of their orders and the Bankruptcy Code, courts have the authority to "issu[e] sanctions in the form of 'actual damages, attorney's fees, and when appropriate, punitive damages.'" *In re Kirkbride*, 2010 Bankr.LEXIS 4103, *13 (Bankr.E.D.N.C., Nov. 19, 2010) *quoting In re Cherry*, 247 B.R. 176 at 187; *see, e.g., Am. Airlines Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000) ("Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained."); *In re Cherry*, 247 B.R. 176 at 187. "One of the primary purposes of the [Bankruptcy Code] is to 'relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.'" *Local Loan Co. v. Hunt*, 292

U.S. 234, 244 (1934) (*quoting Williams v. U.S. Fidelity & G. Co.*, 236 U.S. 549, 554–55 (1915)). Bankruptcy courts "have inherent contempt powers in all proceedings, including bankruptcy, 'to achieve the orderly and expeditious disposition of cases.'" *Jove Eng'g, Inc. v. IRS (In re Jove Eng'g, Inc.)*, 92 F.3d 1539, 1553 (11th Cir. 1996) (citation omitted).

159.    The purpose of civil contempt is to "coerc[e] compliance with the orders of the court and/or to compensate a party for losses incurred as a result of the noncompliance." *In re Armstrong*, 99 B.R. 713, 714 (Bankr.E.D.N.C.1989). To establish civil contempt in the Fourth Circuit, the proponent must establish each of the following elements by clear and convincing evidence:

> (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) . . . that the decree was in the movant's "favor"; (3) . . . that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) . . . that [the] movant suffered harm as a result.

*Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000) (internal quotations omitted); *accord In re Adams*,  2010 Bankr. LEXIS 2207, *6 (Bankr.E.D.N.C., July 7, 2010).

160.    CitiMortgage and Shellpoint had actual and constructive knowledge of the Confirmation Order, including the provisions of the confirmed plan, and the

Discharge. *See Maryland v. Antonell Creditors' Liquidating Trust*, 123 F.3d 777, 783 (4th Cir. 1997) (recognizing that "for purposes of enforcing bankruptcy orders, we inquire whether . . . the notice received was 'of such a nature as reasonably to convey the required information.'" (*quoting Mullane v. Central Hanover Bank & Trust*, 339 U.S. 306, 314 (1950))).

161.    The Discharge Order was served on Shellpoint. As a result, Shellpoint had actual and constructive notice and knowledge of Ms. Bivens's Discharge Order, which was in her favor. *See Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000).

162.    It is undisputed that CitiMortgage and Shellpoint had notice of the obligations imposed by the confirmed plan, the Confirmation Order, the Discharge (Shellpoint only), and the provisions of the Bankruptcy Code per, at the very least, its receipt of the communications from Ms. Bivens and her counsel, and the communications it received directly from the Bankruptcy Noticing Center.

163.    Instead of treating the Account consistent with the Confirmation Order, CitiMorgage and Shellpoint misapplied and failed to credit payments received from the Chapter 13 Trustee.

164.    Contrary to the terms of the confirmed plan, CitiMortgage and Shellpoint misapplied ongoing monthly payments to the prepetition arrearage. By

applying the payments in that fashion, they acted to collect, assess, or recover a claim against the debtor that arose before the commencement of the case.

165.   CitiMortgage and Shellpoint also misapplied prepetition arrearage payments to the ongoing monthly payments. By doing so, they failed to credit payments received under the confirmed plan.

166.   CitiMortgage and Shellpoint also misapplied ongoing monthly payments to months other than that which were designated. By doing so, they failed to credit payments received under the confirmed plan.

167.   Shellpoint was, or should have been, aware of the Chapter 13 Plan completion and discharge injunction.

168.   Shellpoint's  repeated requests for payment from Ms. Bivens of thousands of dollars, including amounts that had already been paid during the Chapter 13 Plan, were and are willful violations of the Discharge Order.

169.   Shellpoint knew or should have known — when it undertook the course of conduct described herein, in violation of the Bankruptcy Code — that its actions and course of conduct were prohibited by the confirmed plan, the Confirmation Order, and the Discharge.

170.   Despite notice of the confirmed plan, the Confirmation Order, and the

Discharge, Shellpoint persisted in violating the Bankruptcy Code.

171.    CitiMortgage and Shellpoint failed to properly apply Chapter 13 Trustee payments during the pendency of Ms. Bivens's Chapter 13 Plan. CitiMortgage then communicated inaccurate Account information to Shellpoint. Their conduct led to Shellpoint demanding post-discharge payments of amounts that had already been paid during the Chapter 13 Plan and threatening to foreclose on her home of over fifty years.

172.    Ms. Bivens performed every requirement placed upon her by the Bankruptcy Code with the expectation that upon entry of the Discharge (after remittance of the payments called for under the confirmed plan and Confirmation Order), she would have an opportunity to thrive without continued harassment from Shellpoint. On the contrary, Shellpoint's actions "have not only had an impact on the debtors in terms of time and energy consumption, but also in their ability to obtain a fresh start through bankruptcy." *In re Kirkbride*, 2010 Bankr. LEXIS 4103 at *6; *see In re Barbour*, 77 B.R. 530, 532 (Bankr. E.D.N.C. 1987) ("There is nothing more essential to a bankruptcy case than the preservation of the integrity of a debtor's discharge.").

173.    CitiMortgage's and Shellpoint's conduct has caused Ms. Bivens to suffer

actual damages, as described herein, including but not limited to 1) questioning whether she should have ever filed bankruptcy; 2) reducing her credit score; 3) worrying that her home of over fifty years would be taken from her; 4) having nightmares about the loss of her home, which wake her up in the middle of the night; 5) losing several hours of sleeps over many nights; 6) suffering through many hours of being unable to fall asleep; 7) suffering through sleepless nights; 8) losing focus during her work day; 9) feeling uncomfortable leaving her home, fearing that she will return to see a padlock on the front door; 10) believing that her home was on a pre-foreclosure list because people were looking at her home and commenting on wanting to live there; 11) placing "No Trespassing" signs on her property; 12) seeking the assistance of a psychiatric medical professional; and 13) suffering severe and overbearing emotional distress and anxiety.

174.    Emotional distress, which can constitute actual damages arising from a creditor's actions and conduct, is present here because the actions taken by CitiMortgage and Shellpoint were particularly egregious. *In re Nibbelink*, 403 B.R. 113, 120-21 (Bankr.M.D.Fla. 2009); *Dawson v. Washington Mut. Bank, F.A. (In re Dawson)*, 390 F.3d 1139, 1150 (9th Cir. 2004) (holding that significant emotional distress is readily apparent where the conduct is egregious and corroborating

medical evidence is not required).

175.    Alternatively, and in the absence the egregious nature of the violations by CitiMortgage and Shellpoint, Ms. Bivens is entitled to damages arising from the emotional distress because she has, "in fact suffered significant emotional harm and the circumstances surrounding the violation make it obvious that a reasonable person would suffer significant emotional harm." *In re Dawson*, 390 F.3d at 1151. Indeed, CitiMortgage violated this Court's Confirmation Order, Discharge Order, and the Bankruptcy Code and Rules, and provided its transferee Shellpoint with inaccurate information. Shellpoint compounded the problems by similarly violating this Court's Confirmation Order, Discharge Order, and the Bankruptcy Code and Rules, and then collecting several ongoing monthly payments twice – once from Trustee Hutson and a second time from Ms. Bivens – and threatening Ms. Bivens with foreclosure after discharge.

176.    As alleged herein, Ms. Bivens is entitled to actual damages, including those for significant emotional distress, aggravation, and inconvenience accompanying, and suffered as a direct result of, the actions and conduct of CitiMortgage and Shellpoint.

177.    Additionally, CitiMortgage's and Shellpoint's conduct caused Ms.

Bivens to incur attorney fees, which were reasonable and necessary to protect the rights she received in the Bankruptcy Case, including those under the Confirmation Order, the confirmed plan, the Discharge, and/or the Bankruptcy Code.

178.    Based on the pattern and practice of CitiMortgage and Shellpoint, which will be proven though discovery, this Court should award Ms. Bivens punitive damages which are sufficient to prevent CitiMortgage and Shellpoint from continuing to engage in this conduct, which is in willful disregard of the Orders of this Court, the provisions of the Bankruptcy Code and Rules, and otherwise to deter such future conduct in the U.S. Bankruptcy Court for the Middle District of North Carolina.

179.    Absent an award of punitive damages by this Court, and upon information and belief, CitiMortgage and Shellpoint will continue to engage in conduct and undertake actions which are in direct violation of the protections afforded to Ms. Bivens and others before this Court, under the Bankruptcy Code, including the confirmed plan, the Confirmation Order, and/or the Discharge.

180.    Ms. Bivens made all payments required during her Chapter 13 Plan, and Trustee Hutson made all payments required by the Confirmation Order.

181.    Based upon the foregoing, Ms. Bivens is entitled to entry of an Order

holding CitiMortgage and Shellpoint in contempt for its willful and deliberate violations of the  confirmed plan, the Confirmation Order, the Discharge, and the operative provisions of the Bankruptcy Code, including §§ 524 and 1327.

182.    Ms. Bivens is likewise entitled to an award of sanctions against CitiMortgage and Shellpoint consisting of the actual damages that she sustained, the reasonable attorney fees, costs, and expenses that were incurred in connection with the prosecution of this matter and procuring the relief requested herein, and punitive damages in an amount to be determined by the Court on account of the willful, wanton, and malicious violations of the confirmed plan, the Confirmation Order, the Discharge, and/or the operative provisions of the Bankruptcy Code.

## VI.    MOTION FOR FINDING OF VIOLATION OF RULE 3002.1(c) AND RULE 3002.1(g) AGAINST CITIMORTGAGE, INC. AND NEWREZ LLC

183.    Plaintiff incorporates herein all previous allegations.

184.    Pursuant to 11 U.S.C. § 105 and Rule 3002.1(i), Ms. Bivens requests a finding that CitiMortgage violated Rule 3002.1(c) and that Shellpoint violated Rule 3002.1(c) and (g).

185.    CitiMortgage's failure to provide the information required by Rule 3002.1(c) was not substantially justified.

186.    CitiMortgage's failure to provide the information required by Rule 3002.1(c) was not harmless.

187.    Shellpoint's failure to provide the information required by Rule 3002.1(c) and (g) was not substantially justified.

188.    Shellpoint's failure to provide the information required by Rule 3002.1(c) and (g) was not harmless.

**A.    Rule 3002.1(c)**

189.    The Committee Comments emphasize the importance of compliance with Rule 3002.1(c):

> In order to be able to fulfill the obligations of § 1322(b)(5), a debtor and the trustee have to be informed of the exact amount needed to cure any prepetition arrearage, see Rule 3001(c)(2), and the amount of the postpetition payment obligations. If the latter amount changes over time, due to the adjustment of the interest rate, escrow account adjustments, or the assessment of fees, expenses, or other charges, notice of any change in payment amount needs to be conveyed to the debtor and trustee. Timely notice of these changes will permit the debtor or trustee to challenge the validity of any such charges, if appropriate, and to adjust postpetition mortgage payments to cover any undisputed claimed adjustment. Compliance with the notice provision of the rule should also eliminate any concern on the part of the holder of the claim that informing a debtor of a change in postpetition payment obligations might violate the automatic stay.

Rule 3002.1 advisory committee's note.

190.    Compliance with Rule 3002.1(c) is crucial to ensure that a party in interest can request that the Court make a determination under Rule 3002.1(e). By not complying with Rule 3002.1(c), the creditor deliberately keeps the debtor, debtor's counsel, and this Court in the dark as to fees it is assessing to the debtor's account and to which it is applying trustee payments.

191.    CitiMortgage assessed fees, expenses, and charges to the Account without filing the requisite notice and notifying Ms. Bivens, Ms. Bivens's counsel, and Trustee Hutson pursuant to Rule 3002.1(c), including late charges, foreclosure attorney fees, "bankruptcy costs," property inspections, "technology fees," appraisal fees, and "elec invoice fees."

192.    Shellpoint assessed fees, expenses, and charges to the Account without filing the requisite notice and notifying Ms. Bivens, Ms. Bivens's counsel, and Trustee Hutson pursuant to Rule 3002.1(c), including property inspections, broker price opinions, appraisals, attorney fees, court costs, and bankruptcy costs.

193.    Shellpoint's Mortgage Statement dated September 17, 2019, stated that the "Fees/Late Charges" paid year-to-date was $133.50. However, regarding the $133.50 in "Fees/Late Charges," Shellpoint never filed the requisite notice or notified

Ms. Bivens, Ms. Bivens's counsel, and Trustee Hutson pursuant to Rule 3002.1(c).

194.    CitiMortgage's and Shellpoint's failures to comply with Rule 3002.1(c)

prevented Ms. Bivens, her counsel, and Trustee Hutson from utilizing Rule 3002.1(e)

by moving this Court to "determine whether payment of any claimed fee, expense,

or charge is required by the underlying agreement and applicable nonbankruptcy

law to cure a default or maintain payments in accordance with § 1322(b)(5) of the

Code."

**B.    Rule 3002.1(g)**

195.    In his treatise, Judge Lundin remarked on the importance of a creditor

being forthright and honest and providing a complete picture of the mortgage

account when responding to a notice of final cure payment:

> The required statement in response to a Notice of Final
> Cure Payment under Bankruptcy Rule 3002.1(g) is worded
> differently than the Notice of Final Cure Payment itself
> under Bankruptcy Rule 3002.1(f). The notice is worded in
> terms of "final cure payment" and "all plan payments";
> the statement in response must address whether the
> debtor is "otherwise current on all payments consistent
> with § 1322(b)(5) of the Code," itemizing any "required
> cure or postpetition amount" that the mortgage holder
> contends remains unpaid as of the date of the statement.
> **The obvious intent here is that the statement in response
> to a final cure notice must contain a complete picture of
> the status of the mortgage without regard to whether the
> Notice of Final Cure Payment is based on incomplete**

**information. As explained above, trustees often won't know the status of a mortgage in a Chapter 13 case notwithstanding completion of payments under the plan. The statement that a mortgage holder must file in response to a Notice of Final Cure Payment is required by Bankruptcy Rule 3002.1(g) to robustly state whether all amounts required to cure default have been paid and whether all payments are otherwise current under the mortgage.** If the holder does not agree that all defaults have been cured and that all payments are current, the holder must itemize any unpaid amount required to cure—including postpetition amounts. These required itemizations are detailed on Director's Form 4100R. **If mortgage holders and servicers would just try in good faith to comply with the statement requirement in Bankruptcy Rule 3002.1(g), much of the litigation described below would disappear.**

Keith M. Lundin, LUNDIN ON CHAPTER 13, § 131.3, at ¶ 136, LundinOnChapter13.com

(last visited August 18, 2020) (emphasis added).

196.    The Response to Notice of Final Cure Payment filed by NewRez stated, "Creditor states that the debtor(s) are current with all postpetition payments consistent with § 1322(b)(5) of the Bankruptcy Code, including all fees, charges, expenses, escrow, and costs.  The next postpetition payment from the debtor(s) is due on: 02/01/2020." Docket # 61.

197.    Despite it's claim on February 14, 2020 (the date that NewRez filed its Response to Notice of Final Cure), that the next payment was due February 1, 2020,

Shellpoint's Loan History Summary showed that the then-current "Due Date" was actually October 2019. Shellpoint's internal records did not reflect it being due February 1, 2020, as NewRez misrepresented to this Court.

198. Consistent with the Loan History Summary but inconsistent with the information reported to this Court, Shellpoint's Mortgage Statement dated April 17, 2020, contained a Transaction Activity section that described Ms. Bivens's payment (received by Shellpoint in March 2020) as being "Due 10/1/2019."

199. The Loan History Summary and the Transaction Activity contained in the Mortgage Statement demonstrate that Shellpoint failed to comply with the express requirement of Rule 3002.19g) – that the Response to Notice of Final Cure "shall itemize the required cure or postpetition amounts, if any, that the holder contends remain unpaid as of the date of the statement." Rule 3002.1(g).

200. The Transaction Activity contained in the Mortgage Statement and the Loan History Summary also show that NewRez knowingly misrepresented to this Court in its Response to Notice of Final Cure Payment that the "next postpetition payment" was due February 1, 2020.

201. Had NewRez been forthright with this Court, provided information based on its account records, and not misrepresented that crucial information to this

Court, the issue surrounding Ms. Bivens's mortgage account could have been resolved expeditiously prior to discharge, pursuant to Rule 3002.1(h).

202.    Indeed, illustrating Judge Lundin's commentary regarding the importance of the Response to Notice of Final Cure required by Rule 3002.1(g), Shellpoint failed "to robustly state whether all amounts required to cure default have been paid and whether all payments are otherwise current under the mortgage."  Had NewRez "just tr[ied] in good faith to comply with the statement requirement in Bankruptcy Rule 3002.1(g)," this adversary proceeding likely would not have been necessary.

203.    As CitiMortgage failed to provide the information required by Rule 3002.1(c) and NewRez failed to provide the information required by Rule 3002.1(c) and (g), and such failure was not substantially justified nor harmless, Ms. Bivens requests, pursuant to Rule 3002.1(i), that this Court 1) preclude CitiMortgage and NewRez from presenting the omitted information, in any form, as evidence in this adversary proceeding; and 2) award Ms. Bivens other appropriate relief, including reasonable expenses and attorney's fees caused by the failure.

VII.    <u>**COUNT I - 11 U.S.C. § 362**</u>

204.    Plaintiff incorporates herein all previous allegations.

205.   CitiMortgage, directly and indirectly through agents, acted to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title, in violation of 11 U.S.C. § 362(a)(6).

206.   CitiMortgage's direct and indirect actions constituted a willful violation of the automatic stay.

207.   Shellpoint, directly and indirectly through agents, acted to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title, in violation of 11 U.S.C. § 362(a)(6).

208.   Shellpoint's direct and indirect actions constituted a willful violation of the automatic stay.

WHEREFORE, Plaintiff Wendy Bivens requests that judgment be entered in her favor and against Defendants CitiMortgage, Inc. and NewRez LLC for:

1.   Actual damages, pursuant to 11 U.S.C. § 362(k);
2.   Punitive damages, pursuant to 11 U.S.C. § 362(k);
3.   Costs and attorney fees, pursuant to 11 U.S.C. § 362(k); and
4.   Such other relief this Court may deem to be just and proper.

September 11, 2020                LAW OFFICES OF JOHN T. ORCUTT, P.C.

/s/ Craig M. Shapiro
Craig Shapiro (State Bar No. 48887)
Koury Hicks (State Bar No. 36204)

1738 Hillandale Road, Suite D

Durham, North Carolina 27705

Telephone: (919) 286-1695

Fax: (919) 286-2704

cshapiro@johnorcutt.com

khicks@johnorcutt.com

ATTORNEYS FOR PLAINTIFF